**Stella LANCASTER, Plaintiff,**

v.

**John W. GARDNER, Secretary of Health, Education and Welfare, Defendant.**

**Civ. A. No. 5699.**

United States District Court
E. D. Virginia,
Norfolk Division.

March 7, 1968.

L. B. Sachs, Norfolk, Va., for plaintiff.

C. V. Spratley, Jr., U. S. Atty., Norfolk, Va., W. T. Mason, Jr., Asst. U. S. Atty., for defendant.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

Plaintiff seeks a review of the defendant's adverse findings denying to plaintiff the disability benefits alleged to be due her under the Social Security Act. Since plaintiff last met the special insured status requirements through the quarter ending March 31, 1961, it is uncontroverted that, on the basis of her application filed December 7, 1965, she is required to establish that she was under a disability which commenced prior to March 31, 1961. Whether decided under the Act as it existed prior to 1965 or thereafter, we conclude that the answer is the same.

Since the final decision of the Secretary is abundantly supported by substantial evidence, the defendant's motion for summary judgment must be sustained.

At the time of her hearing on May 18, 1966, plaintiff was 51 years of age. Her first husband died in 1948 and, by this marriage, she had five children in the 8 to 18 age group as of 1948. She remar-

ried in 1951 to a man with five children in the 6 to 17 age group at that time. Her second husband died on August 6, 1965.

Plaintiff has an eighth-grade education. Apparently her first employment was with the Ferry Company in 1948. Thereafter, she has had considerable experience as a checker in grocery stores, and has likewise been employed as a waitress.

Her disability complaint is the severity of frequent headaches. Undoubtedly she has had headaches of varying degrees of intensity—and at varying intervals—over a period of many years. Apparently they became more frequent following an operation for hysterectomy in 1949. Nevertheless, she did not seem to be handicapped in securing employment due to her headaches, even though the record reflects that she lost several jobs due to absenteeism because of headaches.

Plaintiff last worked in April 1960 for Be-Lo Supermarket as a relief girl doing the work of a checker, ringing up sales on the cash register and bagging groceries. When questioned by her attorney as to the reason she had not attempted to secure employment after April 1960, the following appears:

"Q. Why have you not attempted anywhere since then?

"A. I didn't have to.

"Q. Could you?

"A. No, I couldn't, but at that time, our children were growing up and leaving home, so I didn't have to work."

Manifestly, from this record, plaintiff could and did work prior to April 1960, but she thereafter found it unnecessary to work until her second husband died on August 6, 1965, and, within four months thereafter, plaintiff applied for disability benefits under the Social Security Act. Irrespective of what her condition may have been in 1965 or subsequent thereto, it is conceded that she must establish her disability, within the meaning of the Act, commencing prior to March 31, 1961. As plaintiff so aptly

stated with respect to her second husband, "I just worked when I was married to him to help out."

If we accept the testimony of the plaintiff, it appears that the intensity of her headaches has been substantially the same ever since 1949. All of the headaches, according to plaintiff, have been coupled with nausea, vomiting, confinement in bed for two days, and required medication.

As early as 1960 the records of Dr. William Bauer reflect treatment for headaches with an initial diagnosis of allergic sinusitis. An x-ray taken on September 27, 1960, showed no sinus abnormalities and a normal skull. On March 2, 1961, Dr. Bauer diagnosed her condition as acute sinusitis, but on November 8, 1961, the diagnosis was bronchitis. Dr. Bauer was not available as a witness as he left the Norfolk area and went to Maryland. He is the physician who was attending the plaintiff when she last worked in April 1960, and for the crucial period prior to March 31, 1961. There is no suggestion from this medical record that plaintiff was unable to engage in any substantial gainful activity by reason of any medically determinable physical impairment which has lasted or could be expected to last for a continuous period of not less than 12 calendar months or, as applied to the Act in effect prior to 1965, "which can * * * be of long-continued and indefinite duration."

Plaintiff rests her case upon the testimony of Dr. Diaz, who first saw her around the middle of the year 1963. Without directing questions to her condition prior to March 31, 1961, Dr. Diaz was asked as to the plaintiff's ability to engage in any regular employment since he had first known her, to which he replied:

"Well, due to the frequency and severity of these headaches, I doubt very much that she is able to fill a job, since when the headache comes, she has to take the medication and go to sleep. Now, these medications—it is

strong and will produce drowsiness and your next day after the headache is gone, she will have the so-called hangover from the drugs."

If Dr. Diaz first saw the plaintiff in mid-1963, it was probably on August 24, 1963, when she was confined in Leigh Memorial Hospital as an aftermath of an automobile accident occurring some weeks prior thereto in which she sustained a mild whiplash injury. She remained in the hospital for six days.

On September 16, 1964, plaintiff was again admitted to the same hospital at the instance of Dr. Diaz. The final diagnosis after ten days of treatment and consultation was "persistent headaches due to (a) migraine, (b) Histamine." The history taken from plaintiff reveals in part:

"Pt. can recall when before last 2 yrs. she seemed to have normal headaches that could be relieved by ASA. Then she began to have different kind that came on mainly at night and would last 6–48 hrs."

The discharge summary as prepared by Dr. Diaz reads:

"This patient was admitted because of persistent, frequent and severe headaches , since about a year ago after an automobile accident. These headaches are gradually getting more often and worse associated with nausea and severe vomiting. These headaches have been treated as migraine and tension headaches without proper results. The patient was admitted for care and diagnosis. Skull films were taken and reported as negative. A spinal tap was done on two occasions and only a few red cells were found. The possibility of a cerebral aneurysm was considered but the patient refused any further studies as suggested by Dr. Sawyer who was a consultant. Sedative and medication for pain was used.

Histamine tests were positive. The patient was discharged to be followed up as an out-patient and Histamine desensitivation will be used."

Following this brief period of hospitalization in September 1964, plaintiff proceeded to take injections to relieve the release of histamine that might have produced the headaches. She improved, according to Dr. Diaz, and her headaches became "far apart." However, Dr. Diaz states that a few months prior to May 18, 1966 (the hearing date), her headaches had been coming on a weekly basis and Codeine was prescribed. His final diagnosis of her condition is vascular migraine intractable headaches.

When Dr. Diaz first examined plaintiff, he described her as having "borderline high blood pressure." Her admission record at Leigh Memorial Hospital on September 16, 1964, gives her blood pressure as 122/80. She was then 49 years of age, described as slightly obese, weighing 173 pounds, with a height of five feet four inches. Whatever plaintiff's blood pressure reading may have been on other occasions, it is obvious that her blood pressure is not medically related to her past or present complaints.[1]

The effect, if any, of the automobile accident in the fall of 1962 or the spring of 1963 is not disclosed. The admission record and patient's history taken on September 16, 1964, indicates that plaintiff was in Leigh Memorial Hospital for "whiplash" injury during October 1962. However, it is recognized that this may be an error. In any event, the automobile accident took place prior to plaintiff's admission to the same hospital on August 23, 1963, and definitely some months following the crucial date of March 31, 1961.

■ Acknowledging the liberal construction in keeping with the purpose of the Act to be inclusion, rather than ex-

1. The original claim for disability benefits filed December 7, 1965, describes her disabling condition as "high blood pressure." While this claim was executed by plaintiff, it was filled out by a third person. The Court accepts plaintiff's statement that this was an error, and that no claim for disability benefits is predicated upon a condition of "high blood pressure."

clusion, as stated in Underwood v. Ribicoff, 298 F.2d 850 (4 Cir., 1962), and Williams v. Celebrezze, 359 F.2d 950 (4 Cir., 1966), we do not believe that a scrutiny of this record supports any conclusion that plaintiff has met the burden of establishing that her condition is such that she was unable to resume her employment as a checker for which she is well trained. In Dr. Diaz' report of February 18, 1966—only three months prior to his testifying—he states that the headaches had improved and were 8 to 15 days apart. The nature of the work as a relief girl-checker is not such that an occasional enforced absence due to headaches would result in an inability to engage in any substantial gainful activity.[2] We think it abundantly clear that, whatever may have been the impairments of plaintiff at this or any prior time, they had not reached such a stage of severity on March 31, 1961, that she was precluded from engaging in any substantial gainful activity as defined in the Act. Certainly the record is devoid of proof that plaintiff had a medically determinable physical impairment which disabled her from engaging in substantial gainful employment as of March 31, 1961. No record of Dr. Bauer reflects that he ever suggested to plaintiff that she stop working; nor does plaintiff state that she received such advice. The substantial evidence rule is evidence which a reasoning mind would accept as sufficient to support a particular conclusion. Laws v. Celebrezze, 368 F.2d 640, 642 (4 Cir., 1966). There is not only substantial evidence to support the findings and conclusions of the Secretary, but this Court would, on the basis of this record, hold the same way if called upon to decide the case *de novo*.

Let an order be presented granting the defendant's motion for summary judgment.

2. Dr. Diaz reports that plaintiff is menopausal and has been often very nervous due to socio-domestic problems, but he does not indicate that such a condition brought about any inability to engage in any substantial gainful activity.